SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Jeremy Arrington (A-43-24) (090216)**

**Argued October 20, 2025 -- Decided August 3, 2026**

**JUSTICE HOFFMAN, writing for a unanimous Court.**

In this appeal, the Court considers whether a criminal defendant may assert the insanity defense without the support of expert testimony.

On November 5, 2016, defendant Jeremy Arrington broke into a Newark apartment where his former girlfriend's daughter and eight others, including six children, were present. Inside the apartment, Arrington bound and stabbed the occupants and forced one of the children to stab four of the victims. Two victims died from severe stab wounds. One victim died after Arrington shot her in the head. The surviving victims identified Arrington as the person who committed the attack, and he was indicted on 29 counts. Following a three-day hearing, the judge determined that Arrington was competent to stand trial.

Arrington intended to assert an insanity defense but was unable to retain an expert in support of his claim; he therefore sought to testify as a lay witness that, during the events of November 5, "he did not know what he was doing was wrong." The judge precluded Arrington from raising the insanity defense "without a doctor." The jury found Arrington guilty of 28 counts.

Arrington appealed, arguing that the decision to preclude him from raising an insanity defense deprived him of his constitutional right to a complete defense. The Appellate Division affirmed: two judges held that expert testimony is required for an insanity defense; the third member of the panel concurred, opining that the insanity defense should not be categorically barred in the absence of expert testimony. See generally 480 N.J. Super. 428 (App. Div. 2024). The Court granted Arrington's petition for certification, limited to the issue of whether the insanity defense requires expert testimony. 260 N.J. 208 (2025).

**HELD:** Determinations regarding the existence of a "disease" and its impact upon the defendant at the time of the charged offense lie beyond the common experience of laypersons and require particularized expertise; accordingly, a defendant must proffer expert testimony to assert an insanity defense.

1

1. A defendant's right to present a defense is not absolute -- it is subject to the Rules of Evidence. Expert testimony is admissible when (1) the intended testimony concerns a subject matter that is beyond the ken of the average juror; (2) the field testified to is at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness has sufficient expertise to offer the intended testimony. When a subject is so esoteric that jurors of common judgment and experience cannot form a valid conclusion, expert testimony is not merely admissible -- it is required. An evolving understanding of the nature and complexities of an established subject can lead to shifts in mandatory evidentiary showings, including whether expert testimony is required and its permissible limits. In Ake v. Oklahoma, for example, the United States Supreme Court considered "the pivotal role that psychiatry has come to play in criminal proceedings" and required "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. 68, 79-83 (1985). Although Ake did not address whether expert testimony must be introduced to support an insanity defense, the new rule it announced recognizes the complexity of the medical underpinnings of the legal insanity defense and supports the Court's decision in this matter. (pp. 11-15)

2. New Jersey's insanity defense derives from the rule set forth in M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843); medical testimony was commonly offered in support of the insanity defense even at the time of M'Naghten. In 1846, the New Jersey Supreme Court adopted the M'Naghten Rule and underscored the value of testimony by doctors familiar with the defendant in support of the insanity defense. And in Graves v. State, the Court of Errors and Appeals determined that testimony by a defendant invoking the insanity defense, though admissible, could not alone sustain the defense. See 45 N.J.L. 347, 350, 359-60 (E. & A. 1883). The Legislature later codified the M'Naghten Rule: N.J.S.A. 2C:4-1 provides that, to be found not guilty by reason of insanity, a defendant must have a "disease of the mind" that causes the defendant to "labor[] under" "a defect of reason" severe enough that the defendant either did not "know the nature and quality of the act he was doing" or "did not know what he was doing was wrong." (pp. 15-21)

3. Several material terms used in N.J.S.A. 2C:4-1, including "disease of the mind," are not contemporary medical terms. At the time the insanity defense was codified, however, "disease of the mind" broadly encompassed any mental illness or disorder. Although New Jersey courts have not considered outright whether expert medical testimony is required to assert the insanity defense, they have suggested as much. The Court reviews relevant case law, as well as federal precedent and case law from other states that follow the M'Naghten Rule and that similarly underscore the importance of expert witness testimony in insanity defense cases. (pp. 22-26)

2

4.  The Court concludes that the insanity defense must be supported by expert testimony.  While the testimony of a psychiatrist or psychologist offers strong support for an insanity defense, experts in other relevant fields are not precluded from meeting this requirement of the defense, provided the court is satisfied their testimony complies with N.J.R.E. 702.  The determination of whether a mental disease rendered an individual incapable of comprehending the nature of the criminal act or its wrongfulness necessitates expert testimony.  Equipped with expert guidance, jurors can make an educated determination about the mental condition of the defendant at the time of the offense.  In fact, because the statute and the relevant model jury charge expressly refer to "disease," the absence of expert testimony may in and of itself lead jurors to conclude that a defendant fails to satisfy the requirements for the insanity defense.  Without expert testimony, there is also a risk that jurors will base their conclusions about the existence or impact of a mental disease on conjecture or speculation, rather than on reliable evidence.  Explaining that expert medical testimony in support of the insanity defense has gained increasing importance along with our improved understanding of the complexities of mental disorders, the Court holds that it is now indispensable.  (pp. 27-31)

5.  The Court explains in detail why, even if it did not require expert testimony to support the insanity defense as a bright line rule, the limited evidence Arrington intended to proffer for the insanity defense was insufficient to warrant a jury instruction on the defense.  The mere fact of a gruesome crime has no determinative bearing on whether Arrington was suffering from a "disease of the mind," or on his reasoning at the operative time.  Rather, the record reflects that Arrington might have been faking symptoms of mental illness -- making expert testimony even more critical.  In requiring an expert opinion to support the insanity defense, the Court does not negate the well-established principle that a lay witness with personal knowledge may also testify with respect to the insanity defense.  Thus, if Arrington had presented acceptable expert testimony on his alleged insanity, lay witnesses or Arrington himself may have been able to provide evidence complementary to the requisite expert testimony, as long as such evidence met all relevant evidentiary rules.  Here, where Arrington planned to offer no evidence -- beyond his own self-serving testimony -- the trial court properly exercised its gatekeeping function in finding Arrington's lack of evidence insufficient to raise the insanity defense, see Graves, 45 N.J.L. at 350, 359-60, while maintaining his right to testify as to his state of mind or version of events.  (pp. 31-37)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

Jeremy Arrington,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| October 20, 2025 | August 3, 2026 |

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Frank J. Ducoat, Deputy Chief Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the briefs).

Michael R. Noveck argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Gibbons, attorneys; Lawrence S. Lustberg, and Madhulika Murali a member of the New York bar, admitted pro hac vice, on the brief).

Liza Weisberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Liza Weisberg, Rebecca Uwakwe, Ezra D. Rosenberg, and Jeanne LoCicero, on the brief).

Thomas R. Clark, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Thomas R. Clark, of counsel and on the brief).

JUSTICE HOFFMAN delivered the opinion of the Court.

In this appeal, we consider whether a criminal defendant may assert the insanity defense without the support of expert testimony.

N.J.S.A. 2C:4-1 (the insanity defense statute) codifies the rule set forth in M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843), for determining legal insanity. The statute provides that a defendant "is not criminally responsible for conduct" if the defendant "was laboring under such a defect of reason, from disease of the mind," which, at the time of the offense, prevented defendant from appreciating "the nature and quality of the act," or from knowing whether the act "was wrong."

Here, defendant Jeremy Arrington sought to advance an insanity defense supported solely by his own lay testimony. Determinations regarding the existence of a "disease" and its impact upon the defendant at the time of the charged offense lie beyond the common experience of laypersons and require

2

particularized expertise; accordingly, the trial court properly declined to instruct the jury as to the insanity defense. We therefore affirm the judgment of the Appellate Division and hold that a defendant must proffer expert testimony to assert an insanity defense.

## I.

## A.

The tragic facts of this case stem from Arrington's violent reaction to a Facebook comment that his former girlfriend's daughter, Asia Whitehurst, posted about him. On November 5, 2016, Arrington broke into a Newark apartment where Whitehurst and eight others, including six children, were present. Inside the apartment, Arrington bound and stabbed the occupants and forced one of the children to stab four of the victims. Two victims died from severe stab wounds. One victim died after Arrington shot her in the head. The surviving victims identified Arrington as the person who committed the attack and, at trial, four surviving victims testified against him.

## B.

Arrington was charged in a twenty-nine-count indictment with multiple murders, felony murder, attempted murder, aggravated assault, criminal restraint, weapons charges, and other related offenses.

Pursuant to N.J.S.A. 2C:4-5 (the competency statute),[1] Arrington was evaluated for his competency to stand trial.  Chester Sigafoos, Ph.D., a psychologist retained by the defense, examined Arrington at the Essex County Jail.  Dr. Sigafoos diagnosed Arrington with a severe intellectual disability, alcohol and PCP use disorders, bipolar disorder, and schizophrenia spectrum disorder.  Based on an interview with Arrington's mother, Dr. Sigafoos also determined that Arrington's "cognitive abilities" had "dropped to a lower level" since his graduation from high school.

The State's psychiatrist, Douglas Smith, M.D., opined that Arrington was "malingering."  In addition to his own interview with Arrington, Dr. Smith based this finding on a note authored by an advanced practice nurse who worked with Arrington at the jail, which stated that Arrington "told [a] mental health counselor he was faking mental illness so it would be in his records for when he goes to court."  Following a three-day competency hearing, the judge found the testimony offered by Dr. Smith more credible than that offered by Dr. Sigafoos and determined that Arrington was competent to stand trial.

---

[1] N.J.S.A. 2C:4-5 empowers the court, for purposes of determining the accused's competency to stand trial, to "appoint at least one qualified psychiatrist or licensed psychologist to examine and report upon the mental condition of the defendant."

At several pretrial conferences, the parties discussed Arrington's intent to advance an insanity defense. Arrington was unable to retain an expert in support of his claim of insanity: Dr. Sigafoos was no longer practicing and was unable to testify; the defense consulted but chose not to retain a psychiatrist; and the Office of the Public Defender decided not to engage a third expert. Consequently, Arrington sought to testify as a lay witness that, during the events of November 5, "he did not know what he was doing was wrong." Arrington posited that his testimony, along with the State's evidence related to the charged offenses, constituted sufficient evidence to satisfy the burden imposed upon defendants in asserting the insanity defense.

Initially, the judge ruled that Arrington could testify on his own without a supporting expert, reasoning that there just "ha[d] to be something, whether it's the defendant's testimony, or a doctor," to proffer an insanity defense. Soon thereafter, the judge reconsidered and precluded Arrington from raising the insanity defense "without a doctor" because "[Arrington is] really not qualified to give an opinion about whether or not he was insane . . . at the time of the offense."

At trial, the State presented overwhelming evidence against Arrington, including consistent and unrebutted testimony from four surviving victims, as well as corroborating forensic and DNA evidence. Arrington did not testify or

5

offer any contradictory evidence. The jury acquitted Arrington of one count of attempted murder but found him guilty of the other twenty-eight counts. Arrington was sentenced to 375 years' imprisonment, including a 281-year period of parole ineligibility.

Arrington appealed, arguing that the trial court's decision to preclude him from raising an insanity defense deprived him of his right to a complete defense, guaranteed by the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution. Looking to the history and plain language of the insanity defense statute, the Appellate Division held that "whether a criminal defendant was 'laboring under such a defect of reason, from disease of the mind' at the time of the charged offense is a complex subject -- one that necessitates expert testimony" from a "mental health professional, not an amateur layperson." State v. Arrington, 480 N.J. Super. 428, 441-42 (App. Div. 2024) (quoting N.J.S.A. 2C:4-1).

Judge Jacobs filed a concurrence agreeing that the trial court properly excluded Arrington's insanity defense under the facts presented. Id. at 453 (Jacobs, J., concurring). Nevertheless, Judge Jacobs stated that the insanity defense should not be categorically barred in the absence of expert testimony but should instead be precluded only where the defendant has not produced reliable evidence in support of the defense. Id. at 451.

6

This Court granted Arrington's petition for certification, limited to the issue of "whether defendant can pursue an insanity defense without accompanying expert testimony from a qualified mental health professional." 260 N.J. 208 (2025). We granted leave for the Association of Criminal Defense Lawyers of New Jersey (ACDL), the American Civil Liberties Union of New Jersey (ACLU), and the Attorney General to appear as amici curiae.

## II.

### A.

Arrington argues that the terms of the M'Naghten Rule, from its inception in the mid-nineteenth century through its current codification, do not require an expert. Because the Legislature deliberately retained the language from M'Naghten, Arrington argues for the adoption of a historical perspective and maintains that the mental-health-related terms of the insanity defense statute should be interpreted consistently with their original mid-nineteenth century meaning, rather than with reference to their contemporary understanding. Moreover, Arrington draws a distinction between the insanity defense statute and the competency statute, which expressly contemplates expert testimony. According to Arrington, the omission of an express "role" for expert testimony in the insanity defense statute reflects legislative intent that such a defense can be established through other means.

7

Arrington contends that lay witness testimony is sufficient to bring an insanity defense and argues that his proposed approach is consistent with the practices in Arizona and Ohio, where expert testimony is not a prerequisite to presenting an insanity defense.

Arrington further submits that the nature of his crimes indicates that he "did not know the difference between right and wrong" and that his own testimony about the events of November 5 should therefore have been sufficient for the jury to be instructed on insanity. He maintains that the trial court's exclusion of his testimony and denial of the insanity defense absent an expert violated his federal and state constitutional rights to present a complete defense.

B.

The ACDL agrees with Arrington that the judgments of the trial and appellate courts run afoul of his federal and state constitutional rights to present a complete defense. According to the ACDL, the relevant evidence rule for the admission of expert testimony, N.J.R.E. 702, does not mandate such testimony in support of any particular defense. Consequently, by compelling Arrington to produce an expert as a part of the reliable evidence required to raise an insanity defense, the trial court, in the ACDL's view, exceeded its authority and infringed upon Arrington's rights.

## C.

The ACLU similarly asserts that the determination of insanity need not hinge on expert testimony, arguing that to hold otherwise violates a criminal defendant's constitutional right to present a complete defense. According to the ACLU, whether a defendant was suffering from a "disease of the mind" that materially impacted the defendant's capacity to understand what the defendant was doing when committing the crime should turn on human experience, not necessarily a medical diagnosis. In the ACLU's view, any burden placed on a defendant's right to a complete defense must withstand rigorous constitutional scrutiny, a standard that the trial court failed to satisfy here.

## D.

The State maintains that the trial judge properly rejected Arrington's insanity defense for failing to proffer an expert witness. According to the State, only a qualified expert is competent to diagnose a "disease of the mind." Likewise, only a qualified expert can opine on the impact of that "disease," at the time of the offense, on a defendant's capacity to know the "nature and quality" of defendant's actions or whether such actions were "wrong."

The State points to underlying principles enunciated in analogous New Jersey cases, as well as cases from other M'Naghten jurisdictions that

explicitly require a defendant to proffer an expert opinion in support of an insanity defense.

E.

The Attorney General similarly argues that an expert is necessary to provide reliable evidence in support of an insanity defense. According to the Attorney General, the language of the insanity defense statute, specifically its use of the term "disease of the mind," is "medical" in nature and thus mandates expert testimony. The Attorney General contends that, without guidance from an expert, the jury may incorrectly infer insanity solely from the disturbing facts of a case, rather than from reliable, scientific evidence. The Attorney General also asserts that this requirement does not violate a defendant's constitutional rights to a complete defense because the defendant retains the opportunity to present lay or expert testimony to challenge the prosecution's proof of mens rea.

III.

We review a trial court's evidentiary rulings for an abuse of discretion. State v. Prall, 231 N.J. 567, 580 (2018). Under that deferential standard, we must uphold a trial court's decision absent a "clear error of judgment" that results in "a manifest denial of justice." State v. Marrero, 148 N.J. 469, 483-

84 (1997) (first quoting State v. DiFrisco, 137 N.J. 434, 496 (1994); and then quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

Here, Arrington alleges that the trial court's requirement of expert witness testimony in support of his insanity defense violated his rights under the United States and New Jersey Constitutions. But a defendant's "fundamental . . . right to present a defense is not absolute" -- it is subject to the Rules of Evidence. State v. Jenewicz, 193 N.J. 440, 451 (2008). The trial court therefore has a duty to act as gatekeeper by ensuring that only competent, reliable evidence is presented to the jury for its consideration. State v. Chen, 208 N.J. 307, 319 (2011); see also Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible . . . ."). And that gatekeeping duty includes determining what kind of testimony -- lay and/or expert -- is competent and reliable with respect to the legal issues presented. Beaven v. Allergan U.S.A., Inc., 264 N.J. 99, 108 (2026) (affirming the trial court's role as gatekeeper to determine the reliability of expert testimony).

The New Jersey Rules of Evidence divide opinion testimony into two distinct categories: lay opinion under Rule 701, and expert opinion under Rule 702. Under Rule 701, a lay witness may not offer an "opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent

11

as [the witness] to form a conclusion[.]'" State v. McLean, 205 N.J. 438, 459 (2011) (first and third alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). Lay opinion testimony may be offered, however, when it "(a) is rationally based on the witness' perception" and "(b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701(a) to (b).

Where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness "may testify in the form of an opinion or otherwise." N.J.R.E. 702. Expert testimony is admissible when "(1) the intended testimony . . . concern[s] a subject matter that is beyond the ken of the average juror; (2) the field testified to . . . [is] at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness . . . [has] sufficient expertise to offer the intended testimony." Kemp ex rel. Wright v. State, 174 N.J. 412, 424 (2002) (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 413 (1992)).

"[W]hen 'a subject is so esoteric that jurors of common judgment and experience cannot form a valid conclusion,'" expert testimony is not merely admissible -- it is "required." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 450 (1993) (quoting Wyatt by Caldwell v. Wyatt, 217 N.J. Super. 580, 591 (App. Div. 1987)). "[T]here are certain situations in which expert testimony

12

must be adduced . . . . where laypersons could not be expected to have sufficient knowledge or experience." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 2.3 on N.J.R.E. 702 (2025). We recently confirmed this principle in State v. Hannah, where we explained that an expert "must testify" on subjects of an "esoteric" nature because such subjects are "beyond the ken of the average juror." 263 N.J. 411, 435, 442 (2026) (quoting Hopkins, 132 N.J. at 450) (identifying circumstances in which New Jersey courts have required expert testimony and holding that the relationship between a cell phone's location and the cell tower to which it connects likewise requires expert testimony).

In Hannah, we required expert testimony with regard to a complex, modern technology. Id. at 442. Our evolving understanding of the nature and complexities of an established subject can likewise lead to shifts in mandatory evidentiary showings -- including whether expert testimony is required and its permissible limits. See, e.g., State v. J.L.G., 234 N.J. 265, 272 (2018) ("Based on what is known today, it is no longer possible to conclude that [Child Sexual Abuse Accommodation Syndrome] has a sufficiently reliable basis in science to be the subject of expert testimony."); State v. Nieves, 262 N.J. 161, 238-39 (2025) (concluding that expert testimony about Shaken Baby Syndrome/Abusive Head Trauma without impact was properly excluded from

13

trial due to lack of "general acceptance in the relevant scientific communities," however, noting that should "new, reliable, scientific evidence" be developed, such evidence "could be presented and considered"). In short, the science behind "certain . . . expert methodology" is not "frozen in time." State v. Olenowski, 255 N.J. 529, 582 (2023).

In keeping with evolving scientific understanding, the United States Supreme Court has recognized the importance of expert testimony with regard to the insanity defense. In Ake v. Oklahoma, the Supreme Court considered "whether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question." 470 U.S. 68, 70 (1985). The Court "beg[a]n by considering the pivotal role that psychiatry has come to play in criminal proceedings." Id. at 79. Noting that "[m]ore than 40 States, as well as the Federal Government, have decided either through legislation or judicial decision that indigent defendants are entitled, under certain circumstances, to the assistance of a psychiatrist's expertise," the Court explained that those "statutes and court decisions reflect a reality that we recognize today, namely, that when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a

14

psychiatrist may well be crucial to the defendant's ability to marshal his defense." Id. at 79-80 (emphasis added). The Court then discussed in detail the important contribution that expert testimony can play with regard to the insanity defense and ultimately held "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id. at 80-83. Although Ake did not address whether expert testimony must be introduced to support an insanity defense, the new rule it announced, ensuring a defendant's access to an expert psychiatrist, recognizes the complexity of the medical underpinnings of the legal insanity defense and supports our decision and its rationale.

IV.

A.

New Jersey's insanity defense derives from the English common law, specifically a rule set forth in 1843 in M'Naghten's Case. That said, issues related to the insanity defense have a long history that predates 1843 and a multi-century trajectory leading to where we find ourselves today.

"[T]he first acquittal on the grounds of 'unsound mind' was recorded in 1505." Joel Peter Eigen, <u>Diagnosing Homicidal Mania: Forensic Psychiatry and the Purposeless Murder</u>, 54 <u>Med. Hist.</u> 433, 435 (2010). "Although medical men were long familiar to the London courtroom in their capacity as specialist witnesses to advise the jury on the timing and cause of death, their participation in trials featuring an insanity plea dates only to 1760," <u>ibid.</u>, when Doctor John Monroe testified about whether certain behaviors were consistent with "lunacy" at a murder trial, <u>Case of Earl Ferrers</u>, 19 How. St. Trials 885, 942-44 (1760).

Prior to 1760, courts were "accustomed to relying upon the recollections of the prisoner's relatives and neighbours who, the common law had long assumed, were in the best position to recount the verbal pandemonium and frightening histrionics of the accused." Eigen, 54 <u>Med. Hist.</u> at 435. From 1760 on, medical witnesses -- the "new courtroom specialists" -- "gained a foothold in the courtroom" and "were by the mid-1840s appearing in nine of ten insanity trials prompted by a personal assault." <u>Id.</u> at 437.

In 1843, twelve judges were summoned before the House of Lords to answer, in the form of an advisory opinion, questions of law following the infamous acquittal by reason of insanity of Daniel M'Naghten for the murder of the private secretary to the Prime Minister of the United Kingdom. <u>See</u>

16

Keith J. B. Rix, <u>Towards a More Just Insanity Defence:  Recovering Moral Wrongfulness in the M'Naghten Rules</u>, 22 <u>BJPsych Advances</u> 44, 44-45 (2016).  Eleven of the judges agreed upon a standard for the insanity defense now widely known as the <u>M'Naghten</u> Rule.  See <u>M'Naghten's Case</u>, 8 Eng. Rep. 718, 719 (H.L. 1843).  Under that rule, for a defendant's criminal conduct to be excused by reason of insanity,

> it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not, know he was doing what was wrong.
>
> [<u>Id.</u> at 722.]

At the same time, the judges were also asked about the limits of medical testimony about insanity.  The eleven-judge majority found that "a medical man conversant with the disease of insanity" could offer opinions derived from the trial proceedings where "the question becomes substantially one of science only."  <u>Id.</u> at 723.  Thus, although not mandatory, medical testimony was offered in support of the insanity defense and the permissible contours of that testimony were beginning to be considered at the time of <u>M'Naghten</u>.

17

B.

1.

In 1846, the New Jersey Supreme Court adopted the M'Naghten Rule. State v. Spencer, 21 N.J.L. 196, 204-05, 208-09 (Sup. Ct. 1846). From the time of the rule's adoption, the law presumed that all persons are sane, and defendants had "the burden of proving insanity as an affirmative defense." State v. Worlock, 117 N.J. 596, 601 (1990). In adopting the rule, the Spencer court discussed at length the evidentiary support needed for an insanity defense, finding that

> [i]t has always been held that medical men may give their opinions in evidence. These are always valuable, and more or less so according to their opportunities of observing the accused at, or about the time of the act complained of.
>
> [Spencer, 21 N.J.L. at 209.]

The Spencer court cautioned that expert witnesses who do not have "intimate" knowledge of the defendant may be of less significant value to the jury than lay witnesses who have "every day" experience with the defendant. Id. at 208.

The Court of Errors and Appeals later echoed the value of medical testimony by doctors familiar with the defendant in support of the insanity defense. See State v. Noel, 102 N.J.L. 659, 679-80 (E. & A. 1926) (finding that "defendant was so insane as to be irresponsible for the crime," and noting

18

that this finding was supported by (1) "the weight of the expert medical testimony"; (2) defendant's history of and treatment for mental illness; and (3) evidence from physicians and attendants at the hospital "who had an excellent opportunity of judging his sanity from observing his actions").

Although the Noel Court stressed the value of medical expert testimony in connection with the insanity defense, it did not mandate such testimony. New Jersey courts had, however, already determined that testimony by a defendant invoking the insanity defense, though admissible, could not alone sustain the defense. See Graves v. State, 45 N.J.L. 347, 350, 359-60 (E. & A. 1883) (affirming jury charge that acquittal for murder is not appropriate unless jury is "fully satisfied" that defendant's statement is "corroborated and supported by the other testimony with regard to his mental condition"). In fact, the defendant's testimony "should be closely scrutinized and received with great caution -- especially where it relates to the state of his mind at the time of the homicide." Id. at 349. Otherwise, "persons accused of crime could discharge themselves by their own testimony," resulting in "the most disastrous consequences." Id. at 350.

2.

In 1951, the New Jersey Legislature first codified the insanity defense. L. 1951, c. 344. New Jersey's initial insanity statute combined an inquiry into

19

a defendant's competency to stand trial with whether defendant was legally insane under the M'Naghten Rule. N.J.S.A. 2A:163-2 (1951) (repealed eff. Sept. 1, 1979 by L. 1978, c. 95). The statute provided that a judge or jury could "determine not only the sanity of the accused at the time of the hearing, but as well the sanity of the accused at the time the offense charged against him is alleged to have been committed." Ibid. After receiving sworn certificates from two physicians, a trial court could "conduct a hearing" with their testimony "as to the mental competency of the accused to stand trial." State v. Whitlow, 45 N.J. 3, 13-14 (1965); see also N.J.S.A. 30:4-27 to -30 (repealed eff. June 7, 1989 by L. 1987, c. 116, § 30). "In appropriate cases," the court would extend its inquiry to whether the defendant established insanity under the M'Naghten Rule "at the time of commission of the offense." Whitlow, 45 N.J. at 14.

Requests for hearings for the court to determine insanity were, according to Whitlow, relatively infrequent. Id. at 15. Instead, to claim insanity, the accused was more likely to "simply advise[] the court or the prosecutor that at the trial he will defend on the ground of insanity." Ibid. In answering the question of whether a defendant's freedom from self-incrimination is invaded by a court order authorizing psychiatric examination, the Whitlow Court declared that "[w]hen a defendant charged with [a] crime pleads mental

20

incapacity to stand trial or innocence by reason of insanity," expert opinion is "obviously . . . necessary." Id. at 10.

In 1978, the Legislature repealed N.J.S.A. 2A:163-2, parsing competency and insanity into two distinct statutes. See L. 1978, c. 95. N.J.S.A. 2C:4-5, the competency statute, expressly authorizes the court to "appoint at least one qualified psychiatrist or licensed psychologist to examine and report upon the mental condition of the defendant" "[w]henever there is reason to doubt the defendant's fitness to proceed." N.J.S.A. 2C:4-5(a).

N.J.S.A. 2C:4-1, the insanity defense statute, formally codified the M'Naghten Rule and provides that

> [a] person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong.

Thus, to be found not guilty by reason of insanity under the current insanity defense statute, a defendant must have a "disease of the mind" that causes the defendant to "labor[] under" "a defect of reason" severe enough that the defendant either did not "know the nature and quality of the act he was doing" or "did not know what he was doing was wrong." N.J.S.A. 2C:4-1.

21

3.

Several material terms used in N.J.S.A. 2C:4-1 are not contemporary medical terms. "Defect of reason" is not a term used in the medical field; rather, it is part of the legal standard of insanity. See Joseph M. Livermore & Paul E. Meehl, The Virtues of M'Naghten, 51 Minn. L. Rev. 789, 800-01 (1967) (explaining that M'Naghten's Case "does not state a test of psychosis or mental illness" but rather "lists conditions under which those who are mentally diseased will be relieved from criminal responsibility," and translating the legal concept of "defect of reason" into "psychologese" as "a defect in the class of mental functions").

And the term "disease of the mind" -- like the term "insanity" itself -- is considered obsolete within the medical community. See Mental Disease, APA Dictionary of Psychology, https://dictionary.apa.org/mental-disease (Apr. 19, 2018) (defining "mental disease" as "an obsolete name for a mental disorder"); compare Stedman's Medical Dictionary 498 (6th ed. 1920) (defining "insanity" as "[a] more or less permanent unsoundness of mind, mental disease; a condition marked by abnormality of the reasoning faculty, delusions . . . . It is an acquired condition . . . and is chronic, thus distinguished from the delirium of fever or shock"), with APA Dictionary of Psychology, https://dictionary.apa.org/insanity (offering no medical definition of the term

22

"insanity" and stating that "in law," insanity is "a condition of the mind that renders a person incapable of being responsible for their criminal acts. . . . Whether a person is insane, in this legal sense, is determined by judges and juries, not psychologists or psychiatrists").

At the time the insanity defense statute was codified as part of the Criminal Code, however, "disease of the mind" was "a broadly inclusive term" encompassing any "mental illness" or "disorder." See Stedman's Medical Dictionary 690 (4th L. Ed. 1976). And although New Jersey courts have not considered outright whether expert medical testimony is required to assert the insanity defense, they have suggested as much. See Whitlow, 45 N.J. at 10 (declaring, in considering defendant's self-incrimination concerns, that "obviously expert medical opinion is necessary" when a defendant pleads not guilty by reason of insanity); Worlock, 117 N.J. at 606 (observing, in the context of a challenge to the jury charge on insanity, that "[g]enerally, the determination of a defendant's ability to distinguish between right and wrong depends on psychiatric testimony"); Mullarney v. Bd. of Rev., 343 N.J. Super. 401, 408 (App. Div. 2001) (holding claimant's contention that his depression affected his ability to comprehend the consequences of his actions is an "esoteric" inquiry requiring expert testimony).

Federal precedent underscores the importance of expert witness testimony in insanity defense cases. See Carter v. United States, 252 F.2d 608, 617-18 (D.C. Cir. 1957)[2] ("The law wants from the medical experts medical diagnostic testimony as to mental illness, if any, and expert medical opinion as to the relationship, if any, between the disease and the act of which the prisoner is accused."); United States v. Sanchez-Ramirez, 432 F. Supp. 2d 145, 149 (D. Me. 2006)[3] (rejecting the defendant's contention that his testimony alone was sufficient to raise insanity at trial; requiring expert testimony to prove "whether [defendant's] mental state was caused by [a] severe mental disease or defect"; and holding that "such matters are 'not within the experience of ordinary jurors'") (quoting United States v. Meader, 914 F. Supp. 656, 659 (D. Me. 1996))); see also United States v. Turner, 61 F.4th 866, 893 (11th Cir. 2023) (evaluating the sufficiency of the defendant's insanity defense and noting that, without the benefit of expert testimony, "the

---

[2] The jury instructions at issue in Carter applied the insanity standard set forth in Durham v. United States, 214 F.2d 862 (D.C. Cir. 1954), which analyzes "the presence of a mental disease or defect and the causal connection between the disease and the criminal act." Carter, 252 F.2d at 614.

[3] Like New Jersey's insanity defense statute, the federal insanity defense requires proof that "'at the time of the commission of the . . . offense' (1) [defendant] 'was unable to appreciate the nature and quality or the wrongfulness of his acts' and (2) that his inability to do so was 'as a result of a severe mental disease or defect.'" Sanchez-Ramirez, 432 F. Supp. 2d at 146 (quoting 18 U.S.C. § 17(a)).

jury would have had to speculate that [defendant] had a severe mental disease or defect and that it in fact caused his wrongful conduct").

In addition, other states that follow the M'Naghten Rule, namely California and Pennsylvania, require a defendant to present expert testimony to advance an insanity defense. For instance, in Fortune, the court found that "a defendant must present expert testimony finding him M'Naghten insane." Commonwealth v. Fortune, 302 A.3d 780, 787 (Pa. Super. Ct. 2023). And, in Moore, the court, after clarifying that a "[m]ental illness . . . is a medical diagnosis," expressly held that "[e]xpert medical testimony is necessary to establish a defendant suffered from a mental disease . . . because jurors cannot make such a determination from common experience." People v. Moore, 117 Cal. Rptr. 2d 715, 723 (Ct. App. 2002) (quoting People v. Kelly, 3 Cal. Rptr. 2d 677, 702 (1992)). Other jurisdictions have codified this principle, mandating that a defendant submit to an expert evaluation prior to raising an insanity defense. See, e.g., People v. Hayes, 364 N.W.2d 635, 636 (Mich. 1984) (precluding defendant from presenting evidence of insanity because of his failure to fully abide by Mich. Comp. Laws § 768.20a(4)'s required psychiatric examination); Mo. Rev. Stat. § 552.020.5 (granting the court authority to order an examination when a defendant pleads insanity and providing that "[a] plea of not guilty by reason of mental disease or defect

25

shall not be accepted by the court in the absence of any such pretrial evaluation which supports such a defense").

Indeed, even in jurisdictions -- including those defendant asks us to follow -- that have not required expert testimony in support of an insanity defense, defendants have presented medical evidence to support the defense. See State v. Bay, 722 P.2d 280, 283-84 (Ariz. 1986) (describing the State's motion in limine to exclude records of the defendant's hospitalization for manic depressive psychosis, arguing that, absent expert testimony, such evidence alone would be insufficient to raise the insanity defense for the jury); State v. Reynolds, 550 N.E.2d 490, 495-96 (Ohio Ct. App. 1988) (holding that defendant could proceed with insanity defense based on evidence of a severe mental disorder requiring antipsychotic medication and lay testimony that defendant was off his prescribed medications and became irrational and aggressive before the offense).[4]

In other words, though courts differ as to whether medical support for the insanity defense must be presented through expert testimony at trial or can

---

[4] Arrington cites State v. Reynolds for the proposition that "[a]t least one" district in Ohio does not require expert testimony to advance an insanity defense. 550 N.E.2d at 496. However, Reynolds is binding only in Ohio's Second District. It bears noting that, in an unpublished decision, a court at the same level (the Eighth District of Ohio) expressly rejected Reynolds and required expert testimony as a prerequisite to asserting insanity.

rely on proofs of historical diagnoses through prescriptions or hospitalizations, some level of medical corroboration has generally been required. As our Court explained in Graves, testimony by the defendant alone is insufficient to sustain an insanity defense; corroboration by other evidence is required. 45 N.J.L. at 350.

Against this backdrop, we turn to the question of whether the insanity defense requires expert testimony.

## V.

## A.

We conclude that the insanity defense -- which requires proof that a defendant suffered from "a mental disease" that caused the type of "defect of reason" specified in N.J.S.A. 2C:4-1 -- must be supported by expert testimony. While the testimony of a psychiatrist or psychologist offers strong support for an insanity defense, our holding does not preclude experts in other relevant fields from meeting this requirement of the defense, provided the court is satisfied that their testimony complies with N.J.R.E. 702.

Again, there are "circumstances in which an expert -- as opposed to a lay witness -- must testify; that is, topics that can be raised only if an expert will testify" because their esoteric nature sets them "beyond the ken of the average juror." Hannah, 263 N.J. at 435, 442. We conclude that the diagnosis of a

27

mental disorder is one such circumstance due to its "complex" nature. See Ake, 470 U.S. at 81 (describing the determination of legal insanity as a "complex and foreign" inquiry); see also In re Commitment of G.G.N., 372 N.J. Super. 42, 56 (App. Div. 2004) (noting the complexity of mental health diagnoses contained in hearsay business records). In fact, "diagnosing and treating a mental health disorder" is such a "highly specialized area of medicine" that it is "better left to the experts who are the most knowledgeable sources of the different diagnoses, treatment, and prognoses." In re Ingersoll, 544 N.E.2d 409, 412 (Ill. App. Ct. 1989).

Not only do medical experts diagnose mental diseases, but they are also critical to the complex and esoteric determination of the contemporaneous impact of an individual's condition on their conduct. See Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/esoteric (last visited July 21, 2026) (defining "esoteric," in part, as being understood only by the "specially initiated"); see also Biunno, Weissbard & Zegas, cmt. 2.3 on N.J.R.E. 702 ("[A]ny claim of mental illness affecting behavior is probably sufficiently esoteric to require expert testimony.").

In Mullarney, for example, a case manager at a hospital alleged that his depression "so affected his judgment that he was incapable of realizing that the unauthorized taking of [a] narcotic patch was illegal." 343 N.J. Super. at 408.

The Appellate Division rejected defendant's argument, finding such a contention "so esoteric that a fact-finder of common judgment and experience cannot form a valid judgment . . . without the assistance of expert testimony." Ibid.; see also State v. Jones, 308 N.J. Super. 174, 185 (App. Div. 1998) (observing that the analysis of a defendant's mental state, evidenced by the force used to break a bone during strangulation, is inherently "esoteric"). Just as the effects of depression on an individual's judgment, or a defendant's mental state as evidenced by the degree of force used to strangle a victim, are matters that necessitate expert testimony, the determination of whether a mental disease rendered an individual incapable of comprehending the nature of the criminal act or its wrongfulness, likewise, necessitates expert testimony.

Requiring an expert to identify a "disease of the mind" and its effect on a defendant is also necessary to enable the jury to fulfill its critical role. The model jury charge governing the insanity defense, which closely mirrors the statutory language, instructs the jury to find a "condition," whether "temporary or permanent," that is a "mental disease" and to determine the contemporaneous impact of such "condition." Model Jury Charges (Criminal), "Insanity (N.J.S.A. 2C:4-1)" (approved Oct. 1988). These determinations involve complex and esoteric psychiatric concepts that are "beyond the ken of the average juror" such that expert testimony is required. See State v. J.T.,

29

455 N.J. Super. 176, 214 (App. Div. 2018) ("[P]sychiatry, as a field of medicine, is beyond the ken of the average juror."). As the United States Supreme Court recognized in Ake, experts "identify the 'elusive and often deceptive' symptoms of insanity," which is necessary to "translate a medical diagnosis" to jurors "who generally have no training in psychiatric matters." 470 U.S. at 80-81 (quoting Solesbee v. Balkcom, 339 U.S. 9, 12 (1950)). Equipped with expert guidance, jurors can then make an "educated determination about the mental condition of the defendant at the time of the offense." Id. at 81.

In fact, because the statute and model jury charge expressly refer to "disease," the absence of expert testimony may in and of itself lead jurors to conclude that a defendant fails to satisfy the requirements for the insanity defense. See United States v. Hall, 93 F.3d 1337, 1343 (7th Cir. 1996) ("[T]he very fact that a layperson will not always be aware of the disorder, its symptoms, or its consequences, means that expert testimony may be particularly important when the facts suggest a person is suffering from a psychological disorder."). Without expert testimony, there is also a risk that jurors will base their conclusions about the existence or impact of a mental disease on conjecture or speculation, rather than on reliable evidence. See State v. Fortin, 189 N.J. 579, 596 (2007) ("Although jurors may draw rational

inferences from the evidence, they are not permitted to speculate or connect the dots on mere surmise.").

Ultimately, the insanity defense implicates complex and esoteric concepts that fall outside the common experience of jurors. Requiring an expert to translate such concepts enables the jury to draw "meaningful inferences" about a defendant's "disease of the mind" and how such a disease affected defendant's reasoning. See Hannah, 263 N.J. at 445. We recognize -- as Arrington has argued and as our above overview of the history of the defense has shown -- that expert testimony was not always required to assert the insanity defense. However, from the time the M'Naghten Rule was established, such testimony was contemplated, and it has gained increasing traction and importance along with our improved understanding of the complexities of mental disorders. See Ake, 470 U.S. at 80. We now hold that it has become indispensable.

B.

With respect to Arrington's case, we conclude that even if we did not require expert testimony to support the insanity defense as a bright line rule, the limited evidence Arrington intended to proffer for the insanity defense was insufficient to warrant a jury instruction on the defense. Therefore, the trial

31

court did not violate Arrington's constitutional rights in precluding him from asserting such a defense absent support from an expert.

The record is devoid of evidence indicating how Arrington intended to prove that he was suffering from a "disease of the mind" that materially and contemporaneously impacted his reasoning. Arrington suggested that he would rely upon his own testimony and the State's evidence to assert that he "would not [have been] able to engage in this type of conduct" -- namely, the crimes committed at the apartment -- "unless he . . . did not know the difference between right and wrong" at the time of the alleged attack. However, the mere fact of a gruesome crime has no determinative bearing on whether Arrington was suffering from a "disease of the mind," or on Arrington's ability to appreciate the nature and quality of his actions or to distinguish right from wrong at the operative time. See Ake, 470 U.S. at 90 (Rehnquist, J., dissenting) ("The evidence of the brutal murders perpetrated on the victims . . . would not seem to raise any question of sanity unless one were to adopt the dubious doctrine that no one in his right mind would commit a murder."). Accepting such reasoning would set a dangerous precedent, where a jury might determine a defendant satisfies the statutory requirements of insanity merely from the recitation of a crime's heinous nature.

Rather, the record reflects that Arrington might have been faking symptoms of mental illness -- making expert testimony even more critical. In a note authored by an advanced practice nurse who evaluated Arrington, the nurse described how Arrington informed a mental health counselor that he was, in fact, faking mental illness "so it would be in his records for when he goes to court." Considering that lay people lack the specialized knowledge required to identify malingering, only an expert opinion could have confirmed or negated the possibility of such a diagnosis in the context of insanity. See State v. Mustafa, ___ N.J. ___, ___ (2026) (slip op. at 27).

In requiring an expert opinion to support the insanity defense, we do not negate the well-established principle that a lay witness with personal knowledge may also testify with respect to the insanity defense. See State v. Morehous, 97 N.J.L. 285, 294 (E. & A. 1922); State v. Risden, 106 N.J. Super. 226, 235 (App. Div. 1969). Although Arrington argues, based on Risden, that lay testimony is independently sufficient, in that case an expert also testified in support of defendant's insanity defense.[5] 106 N.J. Super. at 229. The

---

[5] Arrington also relies on the Court's observation in Morehous that "[l]ay witnesses on insanity may give their opinion of a person's sanity or insanity provided such opinions are based on facts within [t]he knowledge of the witness" to support his contention that lay testimony alone is sufficient to raise an insanity defense. 97 N.J.L. at 294. It bears noting that the role the expert played in Morehous in regard to defendant's insanity is unclear. Regardless,

Appellate Division recognized the significance of lay testimony but did not permit the jury to rely exclusively on lay opinion when determining whether defendant suffered from a "disease of the mind" at the relevant time. Id. at 235-36; see also Whitlow, 45 N.J. at 10 ("Although lay testimony as to insanity might be admissible, it is unlikely in the extreme that exclusive reliance would ever be placed on it.").

Ake also affirmed that lay witnesses may "describe symptoms they believe might be relevant to the defendant's mental state." 470 U.S. at 80. And many M'Naghten jurisdictions similarly allow lay witnesses to make observations about a defendant's conduct but reserve the diagnosis of a mental illness for medical experts. See State v. Davis, 506 S.E.2d 455, 471 (N.C. 1998) (allowing a nurse to report "general observation[s]" about the defendant but not make a "specific psychiatric diagnosis"); State v. Raine, 829 S.W.2d 506, 510-11 (Mo. Ct. App. 1992) (permitting the defendant's family members to describe defendant's behavior but not give an opinion concerning defendant's "mental disease or defect"); Doyle v. State, 785 P.2d 317, 322 (Okla. Crim. App. 1989) (permitting the defendant's sister to testify to defendant's conduct but not his "psychological problems"); Fortune, 302 A.3d

the Court's statement upon which Arrington relies does not support the proposition for which it is proffered and is dicta.

34

at 787 (allowing lay witnesses to "state their observations of [the defendant's] behavior and mental state before and after" the crime but not to testify as to defendant's state of mind at the time of the crime); White v. Commonwealth, 616 S.E.2d 49, 54 (Va. Ct. App. 2005) (observing that lay witnesses may recite defendant's "observed behavior" but may not "express an opinion as to the existence of a particular mental disease or condition" (quoting Mullis v. Commonwealth, 351 S.E.2d 919, 925 (Va. Ct. App. 1987))).

Thus, if Arrington had presented acceptable expert testimony on his alleged insanity, lay witnesses or Arrington himself may have been able to provide evidence complementary to the requisite expert testimony, as long as such evidence met all relevant evidentiary rules.[6]

Arrington further contends that, unlike the competency statute, the insanity defense statute does not expressly contemplate the use of an expert. However, this argument overlooks the development of the insanity defense statute as distinct from the competency statute. As we explained in State v. Gorthy, "[t]he court decides whether a competency hearing is required." 226 N.J. 516, 530 (2016). Thus, the competency statute authorizes the court to appoint experts "who report to the court regarding the defendant's condition

---

[6] We note that Arrington did not proffer the testimony of any additional lay witnesses to testify as to his alleged insanity.

35

and . . . ability to understand and participate in the legal process" in order to assist the court in making an informed decision. Id. at 530-31. Under the previous statutory framework, the court was also empowered to conduct a hearing to determine the defendant's sanity. See Whitlow, 45 N.J. at 14. The Legislature, in distinguishing the competency statute from the insanity statute, withdrew the court's authority to investigate a defendant's sanity prior to trial, thereby placing the responsibility for raising such an issue solely within the defendant's "autonomy." See Gorthy, 226 N.J. at 536. Although the insanity defense statute thus recognizes "the defendant's independent choice" regarding "trial strategy," it does not obviate the need for expert testimony. Ibid. The court's role as gatekeeper persists, requiring judges to evaluate the reliability of evidence before it is presented to the jury. Chen, 208 N.J. at 319.

Here, where Arrington planned to offer no evidence -- beyond his own self-serving testimony -- the trial court properly exercised its gatekeeping function in finding Arrington's lack of evidence insufficient to raise the insanity defense, see Graves, 45 N.J.L. at 350, 359-60, while maintaining his right to testify as to his state of mind or version of events. Though Arrington contends that the trial court's decision to prevent him from advancing an insanity defense improperly infringed upon his constitutional rights, it is well

36

settled that a defendant's right to the defense of his choice is not absolute. Jenewicz, 193 N.J. at 451.

## VI.

A defendant's own testimony, or that of a lay witness alone, is insufficient to advance the insanity defense. A qualified expert must credibly diagnose a "disease of the mind" and elucidate its impact on the defendant's behavior at the time of the offense. Such a requirement aligns with the language of the insanity defense statute; follows precedent interpreting the applicable evidentiary rule in New Jersey as well as precedent from other jurisdictions, including the United States Supreme Court; assists the jury in resolving a complex and esoteric issue that exceeds the common understanding of a lay person; and ultimately safeguards the reliability and the legitimacy of the insanity defense. Here, defendant's proffered testimony failed to satisfy either that standard or the rule set forth over 140 years ago in Graves, 45 N.J.L. at 350, 359-60, that testimony of a defendant alone cannot suffice to support the insanity defense.

Accordingly, we affirm the decision of the Appellate Division.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion.

37